Mark A. Nickel (14082)
**GORDON REES SCULLY MANSUKHANI, LLP**
460 W 50 N, 5th Fl.
Salt Lake City, UT 84101
Telephone: (801) 204-9989
Facsimile: (385) 282-7590
mnickel@grsm.com

Craig J. Mariam (*Pro Hac Vice*)
**GORDON REES SCULLY MANSUKHANI, LLP**
999 W. Main Street, #100
Boise, ID 83702
Telephone: (213) 270-7856
cmariam@grsm.com

*Attorneys for Defendant*
*MAST-JAEGERMEISTER US, INC.*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF UTAH CENTRAL DIVISION

| | |
|---|---|
| ALFWEAR, INC.,<br><br>                    Plaintiff,<br><br>v.<br><br>MAST-JÄGERMEISTER US, INC.,<br><br>                    Defendant. | **DEFENDANT MAST JAEGERMEISTER US, INC.'S MOTION FOR SUMMARY JUDGMENT AND SUPPORTING MEMORANDUM OF LAW**<br><br>Case No. 2:17-cv-00936-TC-DBP<br><br>Judge Tena Campbell<br>Magistrate Judge Dustin B. Pead |

Pursuant to Federal Rule of Civil Procedure 56 and DUCivR 56-1, Defendant Mast-Jaegermeister US, Inc. ("MJUS") respectfully moves this Honorable Court for summary judgment on plaintiff Alfwear, Inc.'s ("Alfwear") claims for federal trademark infringement, federal unfair competition, common law unfair competition and dilution.

## TABLE OF CONTENTS

I.      INTRODUCTION AND RELIEF SOUGHT ................................................. 1

II.     STATEMENT OF UNDISPUTED MATERIAL FACTS ............................... 2

        A.      The Parties .................................................................................. 2

        B.      MJUS' Advertising Highlighting Jägermeister's German Heritage ...................... 6

        C.      MJUS' Non-Trademark, Fair Use of "Kühl" for the Word's Literal Meaning ..... 11

        D.      Alfwear's Litigation History ..................................................... 12

        E.      Alfwear's Kühl Marks Are Not Famous or Well-Known. ................................. 12

        F.      There is No Likelihood of Consumer Confusion. ................................. 13

III.    LEGAL STANDARD ......................................................................... 14

IV.     ARGUMENT ................................................................................. 16

        A.      MJUS' Descriptive Use of "Kühl" for Its Literal Meaning, Constitutes "Fair Use" As a Matter of Law .............................................. 16

                1.      MJUS Used "kühl" In a Descriptive Sense to Describe the Temperature at Which Jägermeister is Served and Consumed. ........................ 17

                2.      MJUS Did Not Use "kühl" as a Trademark. ........................... 20

                3.      MJUS Used "kühl" in Good Faith to Describe its Products. .................. 22

        B.      Alfwear Cannot Establish Triable Issues Its Marks are Famous or that MJUS' Advertisements Dilute Alfwear's Trademarks. ................................. 24

        C.      Alfwear Cannot Establish Any Disputed Material Facts that MJUS' Advertisements Have Confused or Will Confuse Consumers. ........................ 26

                1.      Degree of Similarity Between the Marks: Minimal to None. .................. 27

                2.      MJUS' Intent in Adopting the Mark: No Evidence of Intent to Benefit from Alfwear's Reputation or Goodwill. ........................ 29

                3.      Evidence of Actual Confusion: None or de Minimis. ............................. 30

                4.      Similarity of the Products and Manner of Marketing: No Similarities. .... 32

                5.      Degree of Care to be Exercised by Alfwear's Purchasers: High. ............. 34

                6.      Alleged Strength of Alfwear's Marks: Extremely Weak. ........................ 35

D.      Alfwear's Unfair Competition Claim Necessarily Fails. ....................................... 39

V.     CONCLUSION ............................................................................................................ 40

## TABLE OF AUTHORITIES

**Cases**

*Armstrong Paint & Varnish Works v. Nu-Enamel Corp.*,
   305 U.S. 315 (1938)...............................................................................................38

*Beer Nuts, Inc. v. Clover Club Foods Co.*,
   711 F.2d 934 (10th Cir. 1983) ...............................................................16, 28, 33, 34

*Bell v. Harley Davidson Motor Co.*,
   539 F. Supp. 2d 1249 (S.D. Cal. 2008).....................................14, 18, 19, 21, 23, 40

*Beltronics USA, Inc. v. Midwest Inventory Distribution, LLC*,
   562 F.3d 1067 (10th Cir. 2009) ...............................................................................26

*Blau Plumbing, Inc. v. S.O.S. Fix-It, Inc.*,
   781 F.2d 604 (7th Cir. 1986) ....................................................................................37

*Bose Corp. v. QSC Audio Products, Inc.*,
   293 F.3d 1367 (Fed. Cir. 2002) ................................................................................37

*Breakers of Palm Beach, Inc., v. International Beach Hotel Development, Inc.*,
   824 F. Supp. 1576 (S.D. Fla. 1993) .........................................................................36

*Car Freshner Corp. v. Am. Covers, LLC*,
   No. 5:17-cv-171 (TJM/ATB), 2019 U.S. Dist. LEXIS 133095 (N.D.N.Y. Aug. 7, 2019) ...........25

*Car-Freshner Corp. v. S.C. Johnson & Son, Inc.*,
   70 F.3d 267 (2d Cir. 1995) .......................................................................................16

*Carnival Corp. v. SeaEscape Casino Cruises, Inc.*,
   74 F. Supp. 2d 1261 (S.D. Fla. 1999) .......................................................................20

*Citizens Nat'l Bank of Meridian v. Citizens Bank of Phila.*,
   157 F. Supp. 2d 713 (S.D. Miss. 2001) ....................................................................15

*Combe Inc. v. August Wolff GMBH & Co. KG Arzneimittel*,
   382 F. Supp. 3d 429 (E.D. Va. 2019) .......................................................................24

*Cosmetically Sealed Indus., Inc. v. Chesebrough-Pond's USA Co.*,
   125 F.3d 28 (2d Cir. 1997) ...........................................................................17, 18, 22

*Dessert Beauty, Inc. v. Fox*,
   568 F. Supp. 2d 416 (S.D. N.Y. 2008),
   *aff'd*, 329 Fed. Appx. 333 (2d Cir. 2009) ...........................................................18, 19

*First Data Merchant Services Corp., et al. v. Securitymetrics, Inc.*,
   Case No. 1:12-cv-02568-RBD (D. MD. Dec. 3, 2014) ..............................................31

*First Sav. Bank, F.S.B. v. First Bank Sys.*,
101 F.3d 645 (10th Cir. 1996) ..................................................................... 1, 35, 36

*Freedom Sav. & Loan Ass'n v. Way*,
757 F.2d 1176 (11th Cir. 1985) ....................................................................... 35, 36

*Garth O. Green Enters. v. Harward*,
No. 2:15-cv-00556-DN, 2016 U.S. Dist. LEXIS 178938 (D. Utah Dec. 27, 2016) ..................... 39

*Gen. Motors Co. v. Urban Gorilla, Ltd. Liab. Co.*,
No. 2:06-CV-00133 BSJ, 2010 U.S. Dist. LEXIS 136711 (D. Utah Dec. 27, 2010) .................... 27

*General Motors Corp. v. Urban Gorilla, LLC.*,
500 F.3d 1222 (10th Cir. 2007) ............................................................................ 27

*Gracious Lady Service, Inc. v. Welcome Wagon International, Inc.*,
295 F. Supp. 1373 (E.D. Pa. 1969) ........................................................................ 17

*Hard Candy, LLC v. Anastasia Beverly Hills, Inc.*,
921 F.3d 1343 (11th Cir. 2019) ........................................................................... 17

*Hygrade Food Products Corp. v. H.D. Lee Mercantile Co.*,
46 F.2d 771 (10th Cir. 1931) ............................................................................. 16

*Idaho Golf Partners, Inc. v. Timberstone Mgmt., LLC.*,
No. 1:14-cv-00233-BLW, 2017 U.S. Dist. LEXIS 132629 (D. Idaho Aug. 17, 2017) ................. 24

*In re Bos. Beer Co.*,
198 F.3d 1370 (Fed. Cir. 1999) ........................................................................... 38

*Int'l Stamp Art, Inc. v. United States Postal Serv.*,
456 F.3d 1270 (11th Cir. 2006) ...................................................................... 14, 22

*Jean Patou, Inc. v. Jacqueline Cochran, Inc.*,
201 F. Supp. 861 (S.D.N.Y. 1962),
*aff'd*, 312 F.2d 125 (2d Cir. 1963) ...................................................................... 17

*Kellogg Co. v. Nat'l Biscuit Co.*,
305 U.S. 111 (1938) .................................................................................. 38, 39

*King of the Mt. Sports, Inc. v. Chrysler Corp.*,
968 F. Supp. 568 (D. Colo. 1997) ................................... 15, 26, 27, 29, 30, 31, 33, 34, 35

*KP Permanent Make-Up, Inc. v. Lasting Impression I, Inc.*,
543 U.S. 111 (2004) .................................................................................. 16, 17

*Louis Rich, Inc. v. Horace W. Longacre, Inc.*,
423 F. Supp. 1327 (E.D. Pa. 1976) ........................................................................ 17

*M.B.H. Enters., Inc. v. WOKY, Inc.*,
   633 F.2d 50 (7th Cir. 1980) ................................................................................23, 37

*Packman v. Chicago Trib. Co.*,
   267 F.3d 628 (7th Cir. 2001) .....................................................................20, 21, 39

*Paleteria La Michoacana, Inc. v. Productos Lacteos Tocumbo S.A. De C.V.*,
   69 F. Supp. 3d 175 (D.D.C. 2014) ...............................................................................25

*Poison Spider Bicycles, Inc. v. Tap Mfg., Ltd. Liab. Co.*,
   No. 2:16-cv-00148, 2018 U.S. Dist. LEXIS 23495 (D. Utah Feb. 12, 2018) ...............24

*Ringling Bros.-Barnum & Bailey Combined Shows, Inc. v. Utah Div. of Travel Dev.*,
   955 F. Supp. 605 (E.D. Va. 1997),
   *aff'd*, 170 F.3d 449 (4th Cir. 1999).............................................................................24

*Sally Beauty Co., Inc. v. Beautyco, Inc.*,
   304 F.3d 964 (10th Cir. 2002) ............................................................................14, 15

*Sands, Taylor & Wood Co. v. Quaker Oats Co.*,
   978 F.2d 947 (7th Cir. 1992) .......................................................................16, 18, 37

*Sensient Technologies Corp. v. SensoryEffects Flavor Co.*,
   613 F.3d 754 (8th Cir. 2010) ......................................................................................29

*Southeast Clinical Nut. Ctrs., Inc. v. Mayo Found. for Med. Ed. and Research*,
   135 F. Supp. 3d 1267 (N.D. Ga. 2013)...........................................................17, 20, 22

*Soweco, Inc. v. Shell Oil Co.*,
   617 F.2d 1178 (5th Cir. 1980) ............................................................................17, 18

*Squirtco v. Seven-Up Co.*,
   628 F.2d 1086 (8th Cir. 1980) ....................................................................................29

*Sun Banks of Fla., Inc. v. Sun Fed. Sav. & Loan Ass'n*,
   651 F.2d 311 (5th Cir. 1981) ..............................................................................15, 36

*Sunmark, Inc. v. Ocean Spray Cranberries, Inc.*,
   64 F.3d 1055 (7th Cir. 1995) ......................................................................................18

*Team Tires Plus, Ltd v. Tires Plus, Inc.*,
   394 F.3d 831 (10th Cir. 2005) ....................................................................................26

*Tovey v. Nike, Inc.*,
   2014 WL 3510975 (N.D. Ohio 2014).........................................................................18

*Trilink Saw Chain, LLC v. Blount, Inc.*,
   583 F. Supp. 2d 1293 (N.D. Ga. 2008)........................................................................36

*True Form Founds., Inc. v. Bestform Founds.*,
  No. 77-2112, 1977 U.S. Dist. LEXIS 13101 (E.D. Pa. Nov. 4, 1977) ..........................................17

*Universal Money Ctrs., Inc. v. AT&T*,
  22 F.3d 1527 (10th Cir. 1994) .....................................................................................15, 26, 29

*Utah Lighthouse Ministry v. Found. for Apologetic Info. & Research*,
  527 F.3d 1045 (10th Cir. 2008) ...................................................................................................39

*Vail Assocs., Inc. v. Vend—Tel—Co., Ltd.*,
  516 F.3d 853 (10th Cir. 2008) .....................................................................................................30

*Water Pik, Inc. v. Med-Systems, Inc.*,
  726 F.3d 1136 (10th Cir. 2013) .......................................14, 15, 26, 29, 30, 33, 34, 36, 37

*Wonder Labs, Inc. v. Proctor & Gamble Co.*,
  728 F. Supp. 1058 (S.D.N.Y. 1990) .....................................................................................14, 40

*Zatarains, Inc. v. Oak Grove Smokehouse, Inc.*,
  698 F.2d 786 (5th Cir. 1983) ......................................................................................................40

## Statutes

15 U.S.C. § 1052(e) ....................................................................................................................38

15 U.S.C. § 1052(f) .....................................................................................................................38

15 U.S.C. § 1115 .........................................................................................................................14

15 U.S.C. § 1115(b)(4) ........................................................................................................2, 6, 16

15 U.S.C. § 1125 ..................................................................................................................2, 6, 24

15 U.S.C. § 1125(c) .....................................................................................................................15

15 U.S.C. § 1125(c)(2)(A) ......................................................................................................24, 25

15 U.S.C. § 1125(c)(3) .................................................................................................................16

Utah Code Ann. § 70-3a-403 .......................................................................................................24

## Rules

Fed. R. Civ. P. 56(a) ...................................................................................................................14

## Regulations

2 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 11:17 (4th ed.
  1996) ...........................................................................................................................................38

2 McCarthy, *Trademarks and Unfair Competition*, § 11:35 (5th ed.) ...............................................38

3 R. Callman, The Law of Unfair Competition, Trademarks and Monopolies § 81.2, at 577 (3d ed. 1969) .........................................................................................................................34

4 McCarthy § 23:43, at 23-217 ...............................................................................................33

4 McCarthy on Trademarks § 24:106 (4th ed.) ...................................................................24, 25

McCarthy, Trademarks and Unfair Competition § 12.01 (3d ed. 1992) ...................................16, 35

McCarthy, *Trademarks and Unfair Competition* § 15:5, at 15-9 (4th ed. 2001) .............................38

Restatement Third, Unfair Competition § 14, comment a (1995) ...................................................39

# I.    <u>INTRODUCTION AND RELIEF SOUGHT</u>

Trademark protection fosters competition and product quality by securing to the producer the benefits of good reputation.  *First Sav. Bank, F.S.B. v. First Bank Sys*., 101 F.3d 645, 651 (10th Cir. 1996).  It benefits the consumer by preventing confusion about the source of products, and by instilling in consumers "the confidence that inferior goods are not being passed off by use of a familiar trademark."  *Id.*  This case promotes none of those worthy ends: it has nothing to do with competition, product quality, preventing consumer confusion about the source of products, or instilling confidence in consumers that inferior clothing is not being passed off by another company.

That is because this case is not about plaintiff Alfwear, Inc.'s ("Alfwear")[1] need to protect its purportedly valid trademarks on "kühl" from infringement by MJUS, the domestic distributor of the German liqueur Jägermeister, based on MJUS' use of "kühl," the literal German word for cool or cold[2], to describe (in a non-trademark sense) a drink that is and should be served cool or cold.  This case therefore concerns Alfwear's improper attempt to monopolize a common, descriptive German word, "kühl," which Alfwear has unabashedly declared it owns to the exclusion of all other uses.  Trademark law, however, does not allow Alfwear to wield its registrations in this way, and summary judgment in MJUS' favor is proper because there are no triable issues of material fact that: First, MJUS has not used "kühl" as a trademark, brand or source identifier; instead, MJUS fairly uses "kühl" as a merely descriptive or generic term in good faith,

---

[1] At some point recently, Alfwear decided to start calling itself "Kühl" in its correspondence and filings, as though the name change (which does not appear to be a legal formality in any event), would promote its cause.  It is respectfully requested that such gamesmanship be ignored.  And, in any event, a mere fictitious d/b/a name *per se* is not a brand name, much less a trade or service mark; thus, Alfwear's mischaracterization seems to have backfired.

[2] *See,    e.g.,*    https://dictionary.cambridge.org/us/dictionary/german-english/kuhl    or https://en.wiktionary.org/wiki/kuhl (defining "kühl" as meaning "cold, chilly" and "the physical perception of something (objects, weather, body etc.) to have a low temperature). (Ex. 14.)

rendering its advertisements within the fair use exception of 15 U.S.C. Section 1115(b)(4).  Such use is considered fair use under the law, and such fair use is dispositive of this case in its entirety.

Second, Alfwear's marks are not famous or distinctive as required by 15 U.S.C. § 1125, so there is no triable issue of fact on dilution by blurring or tarnishment.  The *single* fame study in this case establishes that Alfwear's "kühl" marks are ***nowhere near*** the legal threshold that courts require for a finding of fame; in fact, Alfwear's marks' combined fame is nearly **zero**.  Alfwear chose *not* to conduct a fame study and, therefore, cannot properly dispute the survey.  And, there is no other evidence that could potentially lead a trier of fact to an alternative conclusion.

Third, as a matter of law or undisputed fact, a consumer of Alfwear's outdoor clothing is not likely to be confused by MJUS' advertisements for an alcoholic drink that uses "kühl" at all, let alone to merely describe how it should be served.  The companies operate in different industries, selling entirely different products, to different consumers, through different sales channels.  Indeed, MJUS' trademark confusion survey showed a net confusion percentage of ***nearly zero*** arising out of the two allegedly offending ads at issue, "Kühl as Ice," and "Drink it Ice Kühl."  In other words, the survey confirmed MJUS' position all along: MJUS' non-trademark use of the word "kühl" for its literal meaning — "cold"— in its advertisements highlighting the Jägermeister liqueur's German heritage has not and will not confuse any consumers.

## II.      STATEMENT OF UNDISPUTED MATERIAL FACTS

### A.      The Parties

1.      Alfwear is a Utah-based manufacturer and retailer of outdoor clothing. (Ex. 1ECF No. 2, ¶¶ 1, 8.)

2.      Alfwear owns registered trademarks (Registrations Nos. 1,990,375, 3,916,866, and 4,441,177) for the word "kühl" for use on clothing, fabric, water bottles, and lip balm as follows:

| | |
|---|---|
| **kühl** | Registration No. 1,990,375 (the "'375 Registration") is for a word plus design mark registered July 30, 1996 for "rugged outdoor clothing, namely jackets, shirts, pants, shorts, T-shirts, and hats," in class 25 and "bottled spring water," in class 032. |
| **KÜHL** | Registration No. 3,916,866 (the "'866 Registration") is for a word mark registered February 8, 2011 for "Belts; Bottoms; Hats; Jackets; Pants; Shirts; Shorts; Tops" in class 025. |
| **KUHL** | Registration No. 4,441,177 (the "'177 Registration") is for a word mark registered November 26, 2013 for "Belts; Bottoms; Hats; Jackets; Pants; Shirts; Shorts; Tops;" and "Fabric Sold As An Integral Component of Finished Clothing, Namely, Belts, Bottoms Hats, Jackets, Pants, Shirts, Shorts and Tops," in class 025, "Lip balm" in class 003, and "Bottled water" in class 032. |

(ECF No. 2, ¶¶ 9-11, 16-18.)

3.      For each of the foregoing marks, the official registration certificates state that the "English translation of the mark is 'cool.'"  (ECF Nos. 2-2, 2-3, and 2-4.)

4.      Alfwear's "kühl" logo, taken from its website, www.kuhl.com, and incorporated into its Facebook page, is depicted as follows:



(Appendix of Evidence ("AOE") Ex. 1.) [3]

---

[3] Pursuant to DUCivR 56-1(b), all exhibits are within the Statement of Evidence and all citations to evidence are to the Appendix of Evidence unless otherwise noted.



(Ex. 2.)

5.      The only category of products available for sale on Alfwear's website, kuhl.com, is outdoor clothing apparel for men, women, and children, and accessories, such as a backpack. Alfwear's product offerings are also listed in its catalog, for which the product table of contents is listed below.   (Ex. 3, ALF000062-66 from Fall/Winter 2017 Catalog, and ALF004030, ALF004032 from 2019 Spring & Summer Collection.)






6.      Alfwear's CEO, Nathan Fay, testified under oath at deposition that Alfwear has not used its marks in connection with the manufacture or sale of alcohol.  (Ex. 4, Deposition of Nathan Fay ("Fay Depo."), 116:22-117:11 [In response to the question "Would you agree that you have not used your name or any of your marks with alcoholic beverages?", Mr. Fay responded, "No, we haven't."]).

7.      Defendant MJUS is a New York corporation and the domestic distributor of Jägermeister, which means "master hunter" in German, and the namesake of the German liqueur created in 1935 and initially imported into the U.S. beginning in the mid-1970s.  (MJUS Answer and Affirmative Defenses (ECF No. 42, ¶¶ 2-3); Ex. 5, Deposition Transcript of Jeff Popkin ("Popkin Depo."), 12:2-13:11.)

8.      On August 17, 2017, Alfwear filed its Complaint for federal trademark infringement of its "kühl" mark covered by the '375, '866, and '177 Registrations, and related claims for federal unfair competition, common law unfair competition, and dilution against MJUS. (ECF No. 2.)  Alfwear alleges that MJUS infringed these three registered marks for the word "KÜHL" in connection with clothing, bottled water, and lip balm by using the phrases "DRINK IT ICE KÜHL" and "KÜHL AS ICE" in advertisements for Jägermeister.  (Id., ¶¶ 16-18, 26, 28-

30.)

9.      On June 13, 2018, MJUS filed an answer to the Complaint and asserted various affirmative defenses, including that MJUS' use of "kühl" was not as a trademark; MJUS used "kühl" to describe a product and used the term in good faith, rendering such use "fair use" under 15 U.S.C. section 1115(b)(4); MJUS' use of "kühl" with alcoholic beverages does not and will not create confusion with respect to Alfwear's outdoor clothing; Alfwear's claims were barred by reason of other parties' use of the "kühl" marks at issue; and Alfwear's marks are not famous and distinctive, as required by 15 U.S.C. section 1125.  (ECF No. 42 at 8-9.)

10.     The parties conducted fact discovery, which closed on February 1, 2019.  (ECF No. 47.)  On August 30, 2019, Alfwear disclosed the reports of its three expert witnesses: Michael Belch, who offered opinions on a trademark confusion survey (Ex. 29); Ravi Dhar, who offered opinions on Alfwear's "KUHL" mark and brand (Ex. 28); and Gavin Harris, who offered opinions on Alfwear's alleged damages.  (ECF No. 68.)  On March 6, 2020, MJUS disclosed its rebuttal expert witnesses, Bruce Silverman and Krista Holt (ECF No. 100), along with their expert disclosures and reports, including a confusion survey and the only trademark fame survey conducted in this case.  (Ex. 6, Declaration of Bruce G. Silverman, Ex. A, March 6, 2020 Report ("Silverman Report"); Ex. 7, Declaration of Krista F. Holt, Ex. B, March 6, 2020 Trademark Survey Report ("Holt Survey Report")).

**B.      MJUS' Advertising Highlighting Jägermeister's German Heritage**

11.     In 2016, MJUS began working with former defendant and advertising agency Opperman Weiss, LLC ("OW") on an advertising campaign for the Jägermeister liqueur that emphasized the brand's 100-year German heritage.  (Ex. 5 Popkin Depo., 15:2-23, 31:6-32:10, 38:21-39:13.)  Consistent with this objective, OW conceived of an advertising campaign that integrated German thematic elements, including German words that are transliterated into same-

sounding English equivalents of the words, including "darke," perfekt," "meister," and "dekadent." (Ex. 9, Deposition of Christopher Peddy ("Peddy Depo."), 37:17-38:7; Ex. 10, JAG000003, JAG000381, and JAG000807.)   These advertisements, which ran in campaigns between 2017-2019, are depicted below.



Screen shot from 2017 Jägermeister TV commercial.
https://www.ispot.tv/ad/wAC6/jagermeister-ice#



Screen shot from 2018-2019 Jägermeister commercial.
https://www.ispot.tv/ad/d7_6/jagermeister-the-perfect-shot





Point-of-Sale Advertisements
At left: JAG000381; Above: JAG000807.

(Ex 10, JAG000003, JAG000381, and JAG000807; Ex. 14, Peddy Depo., 37:17-38:7.)

12.   Consistent with the advertising and marketing objective of highlighting the Jägermeister brand's German heritage, MJUS also integrated the word "kühl"—the German word for "cool" and meaning "cold"—at the suggestion of Paul Opperman, OW's Founder and Creative Director, who saw the word in graffiti in Berlin, Germany while on assignment there for MJUS'

parent company. (Ex. 11, MJUS Resp. to Interrog. No. 7; Ex. 12, OW Resp. to Interrog. No. 1.) In addition to cold in terms of temperature, "kühl" in German also means "cool" in terms of a calm and collected demeanor, and hip and trendy.  (Ex. 13, Opperman Depo. 19:9-20:15, 23:21-25:5, 126:14-127:10; Ex. 14, https://dictionary.cambridge.org/us/dictionary/german-english/kuhl (last visited June 5, 2020).)

13.     At the time MJUS' ad campaign with "kühl" was conceived and devised, MJUS and OW had never heard of Alfwear or KÜHL clothing.  (Ex. 13, Deposition of Paul Opperman ("Opperman Depo."), 114:15-24, 115:9-24, 116:11-19; Ex. 5, Popkin Depo., 104:2-105:9; Ex. 9, Peddy Depo., 72:4-73:17; Ex. 16 Christopher Peddy 30(b)(6) Deposition ("Peddy 30(b)(6) Depo."), 174:13-21; Ex. 11, MJUS Resp. to Interrog. No. 13.)

14.     MJUS used the word "kühl" in its literal sense to convey to its consumers, through a German word readily understood by U.S consumers based on the word's phonetic sound and meaning, that the Jägermeister liqueur was best consumed ice-cold.  (Ex. 15 Popkin 30(b)(6) Depo. 41:6-23; Ex. 5, Popkin Depo. 31:6-32:10, 88:22-89:3; Ex. 16, Peddy 30(b)(6) Depo. 57:14-59:11, 103:22-106:3, 162:5-20; 163:5-14;164:8-19; Ex. 9, Peddy Depo. 18:15 – 22:13, 43:16-44:19). Indeed, to further this objective, MJUS directed its sales personnel and distributors to place ice cold shot machines and ensure that bars were serving the Jägermeister liqueur ice-cold to consumers.  (Ex. 15, Peddy 30(b)(6) Depo., 55:11-25.)

15.     In the ad campaign that used "kühl," MJUS specifically targeted urban millennial consumers aged twenty-one (21) to twenty-nine (29).  (Ex. 13, Opperman Depo., 41:22-42:20; Ex. 16, Peddy 30(b)(6) Depo., 24:17-24, 33:15-34:9, 77:21-78:18.)  In contrast, Alfwear's largest customer base is ages ▮▮▮▮ . ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

16.     From 2017 to 2019, MJUS ran various advertisements on billboards, social media, and television that included the word "kühl" as follows: "DRINK IT ICE KÜHL," "KÜHL AS

ICE," and "ICE KÜHL." (Ex.10, JAG000013, JAG001914, JAG001906, and JAG001908.)  The

advertisements with "ICE KÜHL" also included the words "-18° C TO BE PRECISE" or some

variation on "-18° C." (Ex 10, JAG00005, JAG000018, JAG001914.)   Examples of these

advertisements                           are                         as                      follows:



(Ex.10, JAG000005 "-18° C To Be Precise" Spotify ad)



(Ex. 10, JAG001914 "DRINK IT ICE KÜHL" ad)



(Ex. 10, JAG001906 "KÜHL AS ICE" Facebook ad)



(Ex. 10, JAG001908 "ICE KÜHL" Facebook ad)



(Ex. 10, JAG000013 "ICE KÜHL" billboard)



17.     In very limited instances, MJUS used the word "kühl" in social media posts for Jägermeister for the word's other common and ordinary meaning referring to a calm and collected demeanor, or hip and trendy thing or event.  (Ex. 13, Opperman Depo., 24:8-25:5, 126:14-127:10; Ex. 10, JAG001919, JAG001957.)

18.     MJUS ran *no advertisements* for Jägermeister using only the word "kühl."  (Ex. 10, JAG000001-8, JAG000011-41; Ex. 16 Peddy 30(b)(6) Depo., 138:1-139:16; Ex. 6, Silverman Report, ¶ 68.)

19.     MJUS does not sell Jägermeister directly to any end consumers of the product.  (Ex. 11, MJUS Resp. to Interrog. No. 2; Ex. 16, Peddy 30(b)(6) Depo., 39:9-23.) MJUS sells Jägermeister to distributors, which sell the product to retailers, including grocery and liquor stores, restaurants, bars, and other locations where the end consumers purchase the drink.  (Ex. 11, MJUS Resp. to Interrog. No. 2; Ex. 16 Peddy 30(b)(6) Depo., 39:9-23, 68:24-69:10; Ex. 5, Popkin Depo., 70:18-25, 72:3-5.)   Alfwear's clothing is sold on its website and at specialty clothing and equipment retailers like REI, where Jägermeister is not sold.  (Ex. 18, Alfwear Resp. to Interrog. Nos. 1, 2 and 4.)

20.     MJUS has never sold or produced any clothing featuring the word "kühl" nor has MJUS ever authorized the distribution of such clothing products.  (Ex. 16, Peddy 30(b)(6) Depo., 181:25-182:11; Ex. 10, JAG002052-JAG002098; Ex. 8, MJUS Interrog. Resp. No. 19, MJUS RPD Resp. Nos. 31, 38; ECF No. 106-1, pp. 8-9; ECF No. 109 at pp. 2-3.)

## C.     MJUS' Non-Trademark, Fair Use of "Kühl" for the Word's Literal Meaning

21.     MJUS used "kühl" in its advertisements for Jägermeister to describe the "cool" or "cold" temperature at which the drink is served and consumed. (Ex. 16, Peddy 30(b)(6) Depo., 18:15-22:13; Ex. 9, Peddy Depo., 10:5-15, 11:16-21, 18:18-19:11.)

22.     MJUS did not use "kühl" as a brand or trademark, or to designate the source or

origin of Jägermeister.  (Ex. 16, Peddy 30(b)(6) Depo., 146:2-16, 147:13-148:11; Ex. 6, Silverman

Report, ¶¶ 44-70.)

23.     MJUS did not use "kühl" in connection with clothing, fabric, water bottles or lip

balm.  (Ex. 8, MJUS Resp. to Interrog. No. 19, Request for Prod. No. 31; Ex. 16, Peddy 30(b)(6)

Depo., 81:6-82:4, 146:2-16, 180:1-182:11; Ex. 10, JAG002052-2098; Peddy Declaration ¶ 5; ECF

No. 106-1, pp. 8-9; ECF No. 109 at pp. 2-3.)

24.     Because MJUS did not use the word "kühl" as a brand or a mark, it has never

attempted to register the word as a trademark. (Ex. 16, Peddy 30(b)(6) Depo., 170:9-13; Ex. 11,

MJUS Resp. to Request for Prod. No. 14.)

**D.     Alfwear's Litigation History**

25.     Before the filing of this suit, MJUS' President, Jeffrey Popkin, requested an in-

person meeting with Alfwear's founder, Kevin Boyle, to attempt to resolve this dispute.  (Ex. 15,

Popkin 30(b)(6) Depo., 9:6-12:19).  During that meeting, Mr. Popkin emphasized that MJUS was

using the German word "kühl" to refer to the temperature for consuming Jägermeister liqueur

while highlighting the drink's German heritage.  (*Id*.)  Mr. Popkin reiterated that MJUS' use of the

word "kühl" would be limited, as it had been, to this meaning and context.  (*Id*.)  The next day,

Mr. Boyle called Mr. Popkin, rejecting the olive branch.  (*Id*.)  Mr. Boyle claimed Alfwear "owns"

the word "kühl."  (Ex. 19, Deposition of Kevin Boyle ["Boyle Depo."], 54:4-55:3, 61:23-62:19.)

Indeed, Mr. Boyle testified at deposition that: "People who come out with KUHL . . . we're not

letting it happen. . . . We pretty much try to stop everybody . . ."  (*Id*.)

**E.     Alfwear's Kühl Marks Are Not Famous or Well-Known.**

26.     Numerous companies nationwide offer goods or services under the "kühl" or "kuhl"

names and/or use "kuhl" as part of a URL, including Kühl Beans beer by Four Peaks Brewing

Company; 2Kuhl clothing sold on Amazon; Kuhl Corp. (www.kuhlcorp.com), the world's number

one manufacturer in custom commercial washing equipment founded in 1909; Friedrich's Kühl smart WiFi air conditioners; Kuhl Insurance in Illinois (kuhlinsurance.com); Kuhl's Trailer Sales in Illinois; Kuhl's Electric & Service in Arizona, etc.  (Exs. 20-36.)[4]

27.     Trademark survey expert Krista Holt conducted the only fame survey in this case, studying 394 respondents, of whom only 0.5% of respondents (2 of 394) named Kühl as an outdoor clothing brand in the unaided portion of the fame survey.  (Ex. 7, Holt Survey Report, pp. 5, 38.) After adjusting for survey noise, the name "kühl" had zero percent recognition among survey respondents as compared to well-known outdoor clothing brands like The North Face and Patagonia, which received a 71.4% and 43.5% recognition level, respectively.  (*Id*. at p. 38.)

**F.     There is No Likelihood of Consumer Confusion.**

28.     Alfwear's Vice President, Evan Shapiro, testified at deposition that Alfwear's customers who purchase its kühl-branded clothing are sophisticated and would recognize that the clothing is not made or offered by MJUS or under its Jägermeister brand.  (Ex. 17, Deposition of Evan Shapiro ["Shapiro Depo."], 99:21-100:10.)  Indeed, Alfwear has produced only one example of purported confusion, but of a magazine editor, not of a consumer.  (Ex 18, Alfwear Resp. to Interrog. No. 10.)

29.     The total net confusion percentage for respondents (i.e., past and prospective consumers) exposed to the "KÜHL AS ICE" advertisement was 4.4%.  (Ex. 7, Holt Survey Report, pp. 6, 32-33.)

30.     The total net confusion for respondents (i.e., past and prospective consumers) exposed to the "DRINK IT ICE KÜHL" advertisement was 0.0%.  (Ex. 7, Holt Survey Report, p. 6, 32-33.)

---

[4]   Also available on Amazon are women's clothing sold under the name 2Kuhl: https://www.amazon.com/2kuhl/b/ref=bl_sl_s_ap_web_11188331011?ie=UTF8&node=1118833 1011&field-lbr_brands_browse-bin=2kuhl (visited September 16, 2020) (Ex. 21.)

### III.   <u>LEGAL STANDARD</u>

"'Summary judgment is appropriate if the pleadings, depositions, other discovery materials, and affidavits demonstrate the absence of a genuine issue of material fact and that the moving party is entitled to judgment as a matter of law.'" *Water Pik, Inc. v. Med-Systems, Inc.*, 726 F.3d 1136, 1143-44 (10th Cir. 2013) (citing *Sally Beauty Co., Inc. v. Beautyco, Inc*., 304 F.3d 964, 971 (10th Cir. 2002); Fed. R. Civ. P. 56(a).  "A factual issue is genuine 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Water Pik, Inc.*, 726 F.3d at 1143-44 (citing *Sally Beauty*, 304 F.3d at 972).  "The nonmoving party is entitled to all reasonable inferences from the record; but if the nonmovant bears the burden of persuasion on a claim at trial, summary judgment may be warranted if the movant points out a lack of evidence to support an essential element of that claim and the nonmovant cannot identify specific facts that would  create a genuine issue." *Water Pik, Inc.*, 726 F3d at 1143-44.

At the summary judgment stage, courts determine whether a defendant's use of a disputed mark or term qualifies as fair use under 15 U.S.C. section 1115.  *Int'l Stamp Art, Inc. v. United States Postal Serv*., 456 F.3d 1270, 1277 (11th Cir. 2006) (court affirmed summary judgment in favor of defendant on its fair use defense as there was no evidence in the record defendant intended to benefit from the good will associated with plaintiff's trademark); *Wonder Labs, Inc. v. Proctor & Gamble Co.*, 728 F. Supp. 1058, 1062, 1064 (S.D.N.Y. 1990) (court granted defense summary judgment on fair use defense because defendant's use of "the dentists' choice" was not a trademark infringement; the words were used in their primary sense to describe an important attribute of the product, that it was recommended by dentists); *Bell v. Harley Davidson Motor Co*., 539 F. Supp. 2d 1249, 1258 (S.D. Cal. 2008) (court granted the defense summary judgment because the defendant did not use the disputed term as a trademark, but instead descriptively, fairly and in good faith.).

In the Tenth Circuit, courts may also decide at the summary judgment stage whether a plaintiff's mark is famous within section 1125(c).  "[T]o be famous, a mark must clearly be more than just distinctive in a trademark sense . . ." *King of the Mt. Sports, Inc. v. Chrysler Corp*., 968 F. Supp. 568, 578 (D. Colo. 1997) (granting summary judgment on plaintiff's trademark dilution claim because plaintiff's evidence failed to raise a genuine issue of fact whether its marks were famous) *aff'd by King of the Mt. Sports, Inc. v. Chrysler Corp.*, 185 F.3d 1084 (10th Cir. 1999) (citing *McCarthy*, supra at 24:91 ("very few [trademarks] are 'famous'")).

Similarly, a likelihood of confusion determination is amenable to summary judgment because "courts retain an important authority to monitor the outer limits of substantial similarity within which a jury is permitted to make the factual determination whether there is a likelihood of confusion as to source."  *Universal Money Ctrs., Inc. v. AT&T*, 22 F.3d 1527, 1530 n.2 (10th Cir. 1994); *King of the Mt. Sports, Inc. v. Chrysler Corp*., 185 F.3d 1084, 1089 (10th Cir. 1999) ("the likelihood of confusion issue is amenable to summary judgment in appropriate cases"); *see also Sally Beauty Co., Inc. v. Beautyco, Inc*., 304 F.3d 964, 972 (10th Cir. 2002) ("In this circuit, likelihood of confusion is a question of fact but one amenable to summary judgment in appropriate cases"); *Water Pik, Inc.*, 726 F.3d at 1143 (same).

Finally, in the summary judgment context, courts determine whether evidence of third party use of a mark undercuts the likelihood of customer confusion.  *Citizens Nat'l Bank of Meridian v. Citizens Bank of Phila.*, 157 F. Supp. 2d 713, 719 (S.D. Miss. 2001) (the evidence of third party use led the court to conclude that "summary judgment is warranted in view of the weakness of the Citizens trade name, and the absence of any countervailing circumstances which would tend to show a likelihood of confusion."); *Sun Banks of Fla., Inc. v. Sun Fed. Sav. & Loan Ass'n*, 651 F.2d 311, 316 (5th Cir. 1981) (extensive third-party use of the word "Sun" was impressive evidence that there would be no likelihood of confusion between the parties).

## IV.   ARGUMENT

### A.   MJUS' Descriptive Use of "Kühl" for Its Literal Meaning, Constitutes "Fair Use" As a Matter of Law

A trademark answers the questions "who are you?", "where do you come from?", and "who vouches for you?" McCarthy, Trademarks and Unfair Competition § 12.01 (3d ed. 1992).  "A term or symbol is used as a trademark when the producer uses it to identify the source of his goods to the public and to distinguish those goods from others.  A trademark is a symbol that attracts public attention, is the most prominent element on the package, and dominates the package as a whole." *Beer Nuts, Inc. v. Clover Club Foods Co*., 711 F.2d 934, 938 (10th Cir. 1983).

The Lanham Act's "descriptive fair use" defense allows the use of another trademarked device or term, if such use is "otherwise than as a mark" and is "descriptive of and used fairly and in good faith only to describe the goods or services of such party, or their geographic origin." 15 U.S.C. § 1115(b)(4); *Sands, Taylor & Wood Co. v. Quaker Oats Co.*, 978 F.2d 947, 951 (7th Cir. 1992); *see  Hygrade Food Products Corp. v. H.D. Lee Mercantile Co*., 46 F.2d 771, 772 (10th Cir. 1931) (where a word has acquired secondary meaning by long use in connection with the goods of a particular trader, such word "still belongs to the public in its primary descriptive sense and any person may use it, provided he does so in such a way as not to convey the secondary meaning and deceive the purchasing public."); *see* 15 U.S.C. § 1125(c)(3) ("the following shall not be actionable as dilution by blurring or dilution by tarnishment … (A) Any fair use, including a … descriptive fair use … of a famous mark by another person other than as a designation of source for the person's own goods or services."); *see also KP Permanent Make-Up, Inc. v. Lasting Impression I, Inc.*, 543 U.S. 111, 123-24 (2004).

The key inquiry for whether the fair use defense applies is the ***descriptiveness of the accused designation***, not the descriptiveness of the plaintiff's trademark.  *See, e.g.*, *Car-Freshner Corp. v. S.C. Johnson & Son, Inc*., 70 F.3d 267, 269 (2d Cir. 1995).  "A defendant who raises the fair use

defense – that his use was descriptive, not as a mark, fair, and in good faith – has no burden to negate any likelihood of confusion that his allegedly infringing use would confuse consumers about the origin of the goods or services." *Southeast Clinical Nut. Ctrs., Inc. v. Mayo Found. for Med. Ed. and Research*, 135 F. Supp. 3d 1267, 1276 (N.D. Ga. 2013) ("*Southeast Clinical*") citing *KP Permanent Make-Up, Inc.*, 543 U.S. at 121-24.  "If any confusion results, that is a risk the plaintiff accepted when it decided to identify its product with a mark that uses a well known descriptive phrase." *Id.* at 122 (citing *Cosmetically Sealed Indus., Inc. v. Chesebrough-Pond's USA Co.*, 125 F.3d 28, 30 (2d Cir. 1997)). "[T]here [is] no indication that the [Lanham Act] was meant to deprive commercial speakers of the ordinary utility of descriptive words." *KP Permanent*, 543 U.S. as 122.  Indeed, "[i]t is not a trademark infringement to use words in their ordinary, rather than in their special trademark, meaning." *Louis Rich, Inc. v. Horace W. Longacre, Inc.*, 423 F. Supp. 1327, 1339-40 (E.D. Pa. 1976); *True Form Founds., Inc. v. Bestform Founds.*, No. 77-2112, 1977 U.S. Dist. LEXIS 13101, at *12 (E.D. Pa. Nov. 4, 1977); *Gracious Lady Service, Inc. v. Welcome Wagon International, Inc.*, 295 F. Supp. 1373 (E.D. Pa. 1969); *Jean Patou, Inc. v. Jacqueline Cochran, Inc.*, 201 F. Supp. 861, 865 (S.D.N.Y. 1962), *aff'd*, 312 F.2d 125 (2d Cir. 1963).

       1.     <u>MJUS Used "kühl" In a Descriptive Sense to Describe the Temperature at Which Jägermeister is Served and Consumed.</u>

"A defendant who uses the phrase to describe a product . . . generally uses the phrase in a descriptive sense." *Southeast Clinical*, 135 F. Supp. 2d at 1277-78 ("Lose It!" and "Live It!" describe losing weight and maintaining healthy habits; immaterial that defendant uses the phrases "in capital letters with an exclamation mark.")  A description "identifies a characteristic or quality of an article or service as, for example, its color, odor, function, dimensions or ingredients." *Hard Candy, LLC v. Anastasia Beverly Hills, Inc.*, 921 F.3d 1343, 1363-64 (11th Cir. 2019) ("hard candy" used in a descriptive sense because "it was used to describe the sheen" of the makeup shade that the term labeled) (citing *Soweco, Inc. v. Shell Oil Co.*, 617 F.2d 1178, 1183 (5th Cir. 1980)).

"[I]t is not necessary that a descriptive term depict the [product] itself, but only that the term refer to a characteristic of the product." *Id*. at 1363-64; *Sunmark, Inc. v. Ocean Spray Cranberries, Inc*., 64 F.3d 1055, 1058 (7th Cir. 1995); *Southeast Clinical*, 135 F. Supp. 2d at 1277 ("sweet-tart" was a permissible flavor description, not an infringement of incontestable SWEETART mark); *Sands, Taylor & Wood Co. v. Quaker Oats Co.*, 978 F.2d 947, 952 (7th Cir. 1992) ("The district court thought that in order to be descriptive the term 'Thirst Aid' had to bring to mind the product in question—'create the impression of an isotonic beverage.' Our cases, however, hold that 'it is not necessary that a descriptive term depict the [product] itself, but only that the term refer to a characteristic of the [product].' … Under that test, the district court's conclusion that 'Thirst Aid' is not, as a matter of law, descriptive of Gatorade cannot stand.").

And importantly, "courts have applied the fair use doctrine in situations where the defendant's use of the trademarked phrase described a feeling inherently associated with the phrase or typically experienced by the consumer upon using defendant's product." *Bell v. Harley Davidson Motor Co*., 539 F. Supp. 2d 1249, 1258 (S.D. Cal. 2008); *see also Tovey v. Nike, Inc.*, 2014 WL 3510975, *13-14 (N.D. Ohio 2014) (Nike used the word "boom" in a descriptive sense on its footwear to denote the sports meaning of "boom" as an exciting or important moment in sports competition. A statutory fair use defense was found on summary judgment); *Cosmetically Sealed Industries, Inc. v. Chesebrough-Pond's USA Co.*, 125 F.3d 28, 30 (2d Cir. 1997) (The defendant's use was descriptive because the words were used "to describe an action that the sellers hope consumers will take, using their product."); *Dessert Beauty, Inc. v. Fox*, 568 F. Supp. 2d 416, 425 (S.D. N.Y. 2008), *aff'd*, 329 Fed. Appx. 333 (2d Cir. 2009) (granting summary judgment that use of the phrase "love potion" to describe a fragrance was classic fair use because it was "used to describe the effect that the products may have on whoever 'kisses' or 'tastes' the products worn by the wearer or at least to describe the purpose with which consumers will use the product.").

Here, MJUS, the subsidiary of a German company selling a German product with a German name, used "kühl," a common descriptive German word meaning "cool" or "cold" to advertise and describe the ice-cold temperature at which Jägermeister is to be stored, served and consumed, and therefore, the ice-cold taste and sensation a person feels when consuming the beverage.  This is not trademark use, much less use to identify the Jägermeister liqueur's source or origin.   As evidenced by MJUS' advertisement campaign, from inception to delivery, MJUS used "kühl," frequently with the words -18° Celsius, to describe a characteristic of the Jägermeister product—namely, the ideal temperature at which the beverage is consumed, and the sensation experienced by consumers when they drink Jägermeister as intended: cool, cold, and icy, when they feel the cold temperature.   (Ex. 10, JAG000001-8, JAG000019, JAG001906, JAG001908; Ex. 16, Peddy 30(b)(6)  Depo. 57:14-59:11, 103:22-106:3, 162:5-20; 163:5-14;164:8-19.)   As in *Bell*, 539 F. Supp. 2d at 1258, where the court held that Harley Davidson fairly used the phrase "Ride Hard" to capture the consumer's intended reaction of vigor and energy to its products, or in *Dessert Beauty, Inc.*, 568 F. Supp. 2d at 425 (S.D. N.Y. 2008), where the court held that use of the term "love potion" was classic fair use to "describe the effect that the products may have on whoever 'kisses' or 'tastes' the products worn by the wearer or at least to describe the purpose with which consumers will use the product[,]" MJUS' use of "kühl" to literally convey its intended manner of consumer consumption and reaction of coldness to imbibing Jägermeister at a cool or cold temperature.[5] And, *Alfwear admits in its own trademark registrations that the "English translation of KÜHL in the mark is 'cool.'"*  (Ex. 2-4.)

---

[5] In even the limited instances where MJUS used "kühl" for its other common and ordinary meaning of "cool" in terms of a calm and collected demeanor, or hip and trendy thing or event, such uses also fall squarely within the fair use exception because the word is used only for its ordinary meaning, not as a trademark.

2.      <u>MJUS Did Not Use "kühl" as a Trademark</u>.

The undisputed facts establish that MJUS used "kühl" other than as a mark.  "A putative infringer shows that it uses an allegedly infringing phrase in a non-trademark sense by clearly indicating the actual source of its products." *Southeast Clinical*, 135 F. Supp. 3d at 1276.  In *Southeast Clinical*, the court held that defendant did not use the phrases "Lose It!" and "Live It!" as trademarks because they were "only used . . . as subchapters within [defendant's] diet publications and not as identifiers of the source of the diet publications." *Id*., at 1277.  Instead, "[t]he origin of the diet publications is apparent because Defendant prominently displays the Mayo Clinic name up front, 'on the face[s]' of the book covers." *Id.*; *see also Carnival Corp. v. SeaEscape Casino Cruises, Inc.*, 74 F. Supp. 2d 1261, 1268 (S.D. Fla. 1999) (holding defendant's use of "Fun Ship" was not infringing because defendant's use always included defendant's name, "Seascape.").

*Packman*, 267 F.3d at 639-640, is also instructive on the difference between a descriptive use and a use indicating a source.  In that case, the plaintiff owner of the trademarked phrase "the joy of six" sued the Chicago Tribune newspaper after it ran the phrase on its cover to commemorate the Chicago Bulls winning their sixth NBA championship.  *Id*. at 632.  The court rejected the argument the newspaper used the phrase to identify itself as the source of the newspaper or the championship memorabilia; instead, the newspaper's "distinctive masthead," which appeared "prominently" on the front page and on each piece of memorabilia containing the phrase, identified the source of the products…" *Id*. at 639, 640.  Also, the Tribune used the phrase as a headline to describe a newsworthy event, in a descriptive sense, and stated, "[Plaintiff] cannot appropriate the phrase to herself and thereby prevent others from using the phrase in a descriptive sense, as defendants did here." *Id*. at 641.

Similarly, in *Bell*, 539 F. Supp. 2d at 1258, the plaintiff sued Harley Davidson for trademark infringement over the phrase "Ride Hard," and Harley Davidson asserted the fair use defense in its motion for summary judgment.  The court held Harley Davidson's use of the phrase was a fair use because Harley Davidson did not use the phrase as a trademark to identify the source of its products, and noted that Harley Davidson never registered "Ride Hard" as a trademark, did not use the phrase in isolation on its merchandise, and did not use the phrase exclusively, but used a "wide variety of riding-related slogans on its products."  *Id.*

Similar to *Packman* and *Bell v. Harley Davidson*, all of the Jägermeister advertisements containing "kühl" expressly identify Jägermeister as the source of the product, which is always depicted and displayed with the Jägermeister name, the brand's distinctive orange and green motif, the liqueur's dark green bottle, the deer head motif, or shot glass emblazoned with the Jägermeister name.  (Ex. 10, JAG000001-000008, JAG000011-000034.)  No advertisement by MJUS featured "kühl" standing alone or suggesting "kühl" was the brand or source of the product.  (*Id.*; Ex. 16, Peddy 30(b)(6) Depo., 138:1-139:16; Ex. 6, Silverman Report, ¶ 68.)  As in *Bell*, MJUS: never registered "kühl" or "kuhl" as trademarks precisely because MJUS did not use the word as mark; did not use "kühl" or "kuhl" on the Jägermeister bottles themselves; and did use the word by itself or exclusively on any merchandise, but rather as part of an advertising campaign that highlighted Jägermeister's German heritage and used a variety of German words that were easily transliterated into their English language equivalents.  (Ex. 9, Peddy Depo., 37:17-38:7; Ex. 10, JAG000003, JAG000381, and JAG000807; Ex. 11, MJUS Resp. to RPD No. 12.)

Further, Alfwear can produce no evidence that "kühl" is the most prominent element on the Jägermeister packaging (it is not), or that "kühl" dominates the packaging as a whole (it does not) or that MJUS ever used "kühl" standing alone in an advertisement (it did not).  *Beer Nuts, Inc.*, 711 F.2d at 938.  Rather, "kühl" was simply one of several elements in MJUS' Jägermeister

advertisements that featured several German words to highlight the product's German heritage. (Ex. 6, Silverman Report, ¶ 68; Ex. 15.)  MJUS did not use "kühl" as a trademark or brand; MJUS' only brand is Jägermeister itself, displayed with the deer head logo, cross motif, and dark green bottle.  (Ex. 6, Silverman Report, ¶¶ 40-43, 68; Ex. 16, Peddy 30(b)(6) Depo., 146:2-10, 147:13-148:11; Ex. 10, JAG000013, JAG001914, JAG001906, and JAG001908.)   It is not a "brand" in the sense of what a brand is: a short-hand way for a consumer to organize everything he or she knows about Jägermeister.  (Ex. 6, Silverman Report, ¶ 43.)  MJUS used "kühl" for its literal meaning of "cool" and "cold" because it is easily recognized as such by American consumers speaking English.  (Ex. 9, Peddy Depo., 37:17-38:7; Ex. 16, Peddy 30(b)(6) Depo., 57:14-58:8, 103:22-104:4, 162:5-20.)

### 3.   MJUS Used "kühl" in Good Faith to Describe its Products.

MJUS used "kühl" in good faith to describe its products.  "The standard of 'good faith' for a fair use defense is whether the alleged infringer intended to trade on 'the good will of the trademark owner by creating confusion as to the source of the goods or services.' (citiations omitted)."  *Southeast Clinical*, 135 F. Supp. 3d at 1278.  To evaluate a defendant's good faith, the court inquires into the defendant's "subjective purpose in using the slogan."  *Int'l Stamp Art*, 456 F.3d at 1275.  Clear identification of the actual source of a product — with prominent displays of the defendant's own trademarks, for example — suggests that the defendant used an allegedly infringing phrase in good faith.  *See Int'l Stamp Art*, 456 F.3d at 1275 (finding good faith where the defendant prominently placed its familiar trademarks on the back of a trademarked design, "thereby identifying the products as defendant's products rather than the products of anyone else in the marketplace"); *Cosmetically Sealed Indus. v. Chesebrough-Pond's USA Co.*, 125 F.3d 28, 30 (2d Cir. 1997) ("The non-trademark use of the challenged phrase and the defendants' good faith are both evidenced by the fact that the source of the defendants' product is clearly identified by

the prominent display of the defendants' own trademarks."); *M.B.H. Enters., Inc. v. WOKY, Inc.*, 633 F.2d 50 (7th Cir. 1980) (defendant did not act in bad faith or with the intent to confuse the public about the source of its services by using the allegedly infringing phrase because it also displayed its own trademark identifying defendant as the source of the service); *Bell*, 539 F. Supp. 2d at 1259 (finding that defendant Harley-Davidson "demonstrated its intent not to create confusion" by including the Harley-Davidson name or logo on every advertisement and piece of merchandise containing the accused "Ride Hard" phrase).

Similarly here, MJUS' lack of any intent to create confusion is established by the undisputed fact that the Jägermeister advertisements containing "kühl" identify Jägermeister itself, its logos, its distinctive colors, the dark green bottle or shot glass emblazoned with the Jägermeister name. (Ex. 10, JAG000013, JAG001906, JAG001908 and JAG001914.) No MJUS advertisement featured only "kühl" standing alone or suggesting that "kühl" was the source of the product. (Ex. 6, Silverman Report, ¶¶ 44-70; Ex. 16 Peddy 30(b)(6) Depo., 138:1-139:16.) Further, MJUS used "kühl" in good faith, based on its belief that there was no overlap between its German liqueur and Alfwear's outdoor apparel and clothing line. (Ex. 15, Popkin 30(b)(6) Depo., 10:8-12:19, 41:6-23; Ex. 5, Popkin Depo., 88:22-89:3; Ex. 16, Peddy 30(b)(6) Depo., 33:15-34:15, 146:2-16, 165:3-169:15.)

No authority holds that a plaintiff's alleged rights in a mark can be used to force a defendant to identify its products less than optimally, and MJUS was entitled to use a common German word to accurately describe its product, including how best for consumers to consume it. The holding in *Bell* rings true here: "Whatever the source-identifying significance of Bell's trademark, he cannot hold the phrase hostage against an entity such as Harley-Davidson, which invokes the phrase's long-established meaning to describe the reaction of prospective consumers upon purchasing its products and merchandise." *Bell*, 539 F. Supp. 2d at 1259.

**B.**   **Alfwear Cannot Establish Triable Issues Its Marks are Famous or that MJUS'**
**Advertisements Dilute Alfwear's Trademarks.**

 "To establish a federal or Utah state claim for trademark dilution, plaintiff must establish

that it owns a famous mark and that Defendants' use has or will cause dilution." *Poison Spider*

*Bicycles, Inc. v. Tap Mfg., Ltd. Liab. Co.*, No. 2:16-cv-00148, 2018 U.S. Dist. LEXIS 23495, at

*19-20 (D. Utah Feb. 12, 2018) (citing 15 U.S.C. § 1125; Utah Code Ann. § 70-3a-403).   "A

dilution claim can only be maintained if plaintiff's mark was famous before Defendants began

their use of their logo." *Id.* (citations omitted).  "A mark is 'famous' if 'it is widely recognized by

the general consuming public.'" *Id.*  (citing 15 U.S.C. § 1125(c)(2)(A)).  "Additionally, the court

considers the 'duration, extent and geographic reach of advertising and publicity of the mark'; the

'amount, volume, and geographic extent of sales'; 'extent of actual recognition of the mark'; and

'whether the mark was registered.'"  *Id.*  (citing 15 U.S.C. § 1125(c)(2)(A)).

 "Survey evidence or market research demonstrating widespread brand awareness, or the

lack thereof, weighs heavily in determining a mark's fame."  *Idaho Golf Partners, Inc. v.*

*Timberstone Mgmt., LLC.*, No. 1:14-cv-00233-BLW, 2017 U.S. Dist. LEXIS 132629, at *16-17

(D. Idaho Aug. 17, 2017) (emphasis added) ("…the leading treatise on trademark law recommends

'that a minimum threshold survey response should be in the range of 75% of the general consuming

public of the United States.'") (citing 4 McCarthy on Trademarks § 24:106 (4th ed.) (footnotes

omitted) (finding no evidence in the record to suggest that consumer recognition in plaintiff's

TIMBERSTONE' mark "is so pervasive even in the niche golf market.").[6]

---

[6] *See e.g., Combe Inc. v. August Wolff GMBH & Co. KG Arzneimittel*, 382 F. Supp. 3d 429, 451
(E.D. Va. 2019) ("The results of the Fame Survey are substantial and certainly support a finding
that the VAGISIL mark is commercially famous. Indeed, the 38.7% level of unaided awareness
and the 85% rate of net aided recognition that VAGISIL received in the survey far surpass the
degree of recognition from similar surveys that courts have found sufficient to demonstrate the
commercial strength of a mark."); *Ringling Bros.-Barnum & Bailey Combined Shows, Inc. v. Utah
Div. of Travel Dev.*, 955 F. Supp. 605, 613 (E.D. Va. 1997), *aff'd*, 170 F.3d 449 (4th Cir. 1999)

Alfwear can present no evidence its marks are "widely recognized by the general consuming public," or the "extent of actual recognition of the mark[s]."  15 U.S.C. § 1125(c)(2)(A).  It can provide no survey evidence or market research demonstrating widespread brand awareness, and certainly nothing approaching a minimum threshold survey response in the range of 75% of the general consuming public of the United States.  4 McCarthy on Trademarks § 24:106 (4th ed.).  Alfwear's dilution claim rests entirely on the unsupported conclusions of its expert, Dr. Ravi Dhar, a proffered survey expert who conducted no survey.  (Ex. 28, Dhar Report, ¶¶ 16, 40.)  As Alfwear concedes, all Dr. Dhar did was review the documents Alfwear provided him.  (*Id.* at ¶ 7, Ex. C to Report.)  While Dr. Dhar opines that "kühl" is likely to be perceived by consumers as being connected to MJUS based on "kühl" being "a distinct mark with widespread public recognition," the only fame survey conducted in this case by Krista Holt confirms that Alfwear's "kühl" marks are not famous or distinctive.  (Ex. 7, Holt Survey Report, at 5-6, 38.)

Additionally, MJUS' advertising and marketing expert Bruce Silverman found ***no evidence*** that "kühl" is so closely associated by the public with MJUS that it serves the same purpose as a brand and would be an identifier source.  (Ex. 6, Silverman Report, ¶¶ 44-70.)  Among other notable deficiencies in Dr. Dhar's report, Dr. Dhar concludes that consumers would take the use of the word "kühl" in MJUS' advertisements as a source identifier because some of the

---

(holding that a 41% rate of aided recognition was sufficient to show that the plaintiff's mark was famous); *Paleteria La Michoacana, Inc. v. Productos Lacteos Tocumbo S.A. De C.V.*, 69 F. Supp. 3d 175, 204 (D.D.C. 2014) ("Of course, as with federal dilution, no specific percentage is required as a matter of law, but such a benchmark [of 50%] is helpful nonetheless for sorting out the haves from the have-nots."); *see e.g., Car Freshner Corp. v. Am. Covers, LLC*, No. 5:17-cv-171 (TJM/ATB), 2019 U.S. Dist. LEXIS 133095, at *53 (N.D.N.Y. Aug. 7, 2019) ("Car Freshner Corp.") ("The only evidence provided by the Plaintiffs that the consuming public recognizes the products is the evidence summarized above that Black Ice has appeared in popular culture…and on social media. Plaintiffs do not provide their own fame survey. The Court finds that the evidence presented by the Plaintiffs does not support their claim that either product enjoys broad recognition among the general public or even among automotive air freshener consumers. Even a showing of fame within the particular market would be insufficient.").

advertisements featuring "kühl" did not mention the Jägermeister brand.  (Ex. 28, Dhar Report, ¶ 37.)  However, the undisputed evidence directly contradicts this conclusion because in nearly every instance where MJUS used "kühl" for Jägermeister, it appeared with the Jägermeister name, a picture of the Jägermeister bottle, Jägermeister shot glasses, or the deer head and cross motif which appear on the Jägermeister bottle.   (Ex. 6, Silverman Report, ¶ 68; Ex. 10, JAG000013, JAG001914, JAG001906, and JAG001908.)

Given the dearth of evidence adduced by Alfwear to establish the alleged fame of its "kühl" mark, Alfwear's marks are not famous and cannot be diluted as a matter of law.

## C.   Alfwear Cannot Establish Any Disputed Material Facts that MJUS' Advertisements Have Confused or Will Confuse Consumers.

The central inquiry in a trademark infringement case is the likelihood of consumer confusion.  *Team Tires Plus, Ltd v. Tires Plus, Inc.*, 394 F.3d 831, 832 (10th Cir. 2005).  "[A] plaintiff must demonstrate ***more than isolated instances of actual confusion*** when (1) the trademarked product and the defendant's product are not physically similar or are not used for similar purposes, or (2) the defendant has put on its own substantial evidence demonstrating no significant actual confusion--for example, testimony from consumers stating that they were not confused."  *Beltronics USA, Inc. v. Midwest Inventory Distribution, LLC*, 562 F.3d 1067, 1076 (10th Cir. 2009) (emphasis added); *see  Universal Money Ctrs., Inc. v. Am. Tel. & Tel. Co.*, 22 F.3d 1527, 1534-36 (10th Cir. 1994) (de minimis evidence of actual consumer confusion is insufficient when the defendant introduced substantial and reliable evidence demonstrating no significant actual confusion and when the two marks are not similar); *King of the Mt. Sports, Inc. v. Chrysler Corp.*, 185 F.3d 1084, 1092-93 (evidence of seven episodes of actual confusion was de minimis evidence of actual consumer confusion insufficient "in light of the complete lack of similarity between the defendants' uses and plaintiff's mark."); *see Water Pik, Inc.*, 726 F.3d at 1150-51 (Court found four "isolated episodes" of confusion were insufficient and noted, "We have

consistently recognized, however, that isolated, anecdotal instances of actual confusion may be *de minimis* and may be disregarded in the confusion analysis.  What is required for a claim of trademark infringement under the Lanham Act is a *likelihood* of confusion, not merely the possibility of confusion.").

Where, as here, the parties' products are dissimilar and not overlapping, the word "kühl" is not used as a trademark by MJUS, there is no credible evidence of any actual consumer confusion, and where MJUS has proffered a trademark confusion survey conclusively establishing that no legally significant likelihood of confusion exists, Alfwear cannot carry its burden to establish confusion.

"To determine whether a likelihood of confusion exists, six nonexhaustive factors are considered: (1) the degree of similarity between the products; (2) the intent of the alleged infringer in designing its product; (3) evidence of actual confusion; (4) similarity in how the products are marketed; (5) the degree of care likely to be exercised by purchasers; and (6) the strength of the trade dress. *Gen. Motors Co. v. Urban Gorilla, Ltd. Liab. Co*., No. 2:06-CV-00133 BSJ, 2010 U.S. Dist. LEXIS 136711, at *48 (D. Utah Dec. 27, 2010) (citing *General Motors Corp. v. Urban Gorilla, LLC*., 500 F.3d 1222, 1227 (10th Cir. 2007)).  Consideration of these factors yields only one conclusion: no consumers have been, are, or will be confused by MJUS' use of "kühl" for its literal meaning in its advertisements for Jägermeister.

### 1.   Degree of Similarity Between the Marks: Minimal to None.

Courts "test the degree of similarity between marks on three levels: sight, sound, and meaning…We do not consider these factors in isolation. Instead, we must examine them 'in the context of the marks as a whole as they are encountered by consumers in the marketplace.'"  *King of the Mt. Sports, Inc.*, 185 F.3d at 1090 (internal citations omitted).   "In evaluating similarity, 'it is axiomatic in trademark law that 'side-by-side' comparison is not the test.' . . .  The marks '***must***

*be compared in the light of what occurs in the marketplace, not in the courtroom*.'"  *Beer Nuts, Inc.*, 711 F.2d at 941 (emphasis added).

When considering Alfwear and MJUS' respective use of the term "kühl" in the marketplace, there is no basis for consumer confusion.  While both companies use a common German word, the use of the word by the parties could not be more different.  As noted above, MJUS does not use the word "kühl" as a trademark, but rather in its literal meaning as a German word transliterated into English as "cool" or "cold" to refer to the optimal recommended temperature for consumers to drink the Jägermeister liqueur.  MJUS' use of "kühl" as "cold" was reinforced by the references to -18° Celsius, the presence of ice, and the use of the word "ice" in tandem with "kühl."  (Ex. 10, JAG000013, JAG001906, JAG001908 and JAG001914.)

In contrast, Alfwear uses "kühl" in reference to its outdoor clothing and apparel line, apparently to appeal to outdoor enthusiasts, as evidenced by Alfwear's product catalogs and use of "kühl" on its Facebook Page featuring a man in a canoe on a lake, or people enjoying outdoor activities apparently donned in Alfwear's clothing products.  (Ex. 3, ALF00062, ALF000064, ALF004030, and ALF004032.)  Alfwear's use of "kühl" has nothing to do with the ice cold temperature for consuming an adult beverage.

Moreover, in the actual marketplace, consumers will not encounter the parties' respective uses of "kühl."   The parties' products are entirely distinct, sold in different retail outlets, at very different price points, to different classes of consumers.  (Ex. 4, Fay Depo., 16:14-17:19, 20:7-25; Ex. 18, Alfwear Resp. to Interrog. No. 2.)   Alfwear proudly notes its clothes are sold at REI.  (Ex. 219, Kevin Boyle Depo., 35:6-19; Ex. 18, Alfwear Resp. to Interrog. Nos. 1, 2, 4.)  No REI shopper will encounter Jägermeister liqueur at an REI or a similar clothing retailer.  Similarly, no consumer will encounter Alfwear's clothing in the spirits section of a grocery store or liquor store, or at a bar.

2.      MJUS' Intent in Adopting the Mark: No Evidence of Intent to Benefit from
Alfwear's Reputation or Goodwill.

"The proper focus under this factor 'is whether defendant had the intent to derive benefit

from the reputation or goodwill of plaintiff.'"   *King of the Mt. Sports, Inc.*, 185 F.3d at 1091

(internal citations omitted); *Water Pik, Inc.*, 726 F.3d at 1157; *Universal Money Ctrs., Inc. v.

AT&T*, 22 F.3d 1527, 1532 (10th Cir. 1994).  "Intent on the part of the alleged infringer to pass off

its goods as the product of another raises an inference of likelihood of confusion . . . " *Squirtco v.

Seven-Up Co.*, 628 F.2d 1086, 1091 (8th Cir. 1980).  However, an absence of facts that the alleged

infringer adopted its mark with the intent to derive benefit from a plaintiff's mark will not support

an infringement finding.  *Universal Money Centers*, 22 F.3d at 1532 (affirming summary judgment

of no infringement, stating "the record is void of any evidence that AT&T chose the term

'Universal' with the intent of copying [plaintiff's] marks or confusing the public as to the

sponsorship or affiliation" of the defendant's services).  And, even if a defendant had selected its

mark with advance knowledge of the plaintiff's mark, such knowledge alone does not compel the

conclusion that the defendant possessed the intent relevant to the likelihood-of-confusion analysis.

*Sensient Technologies Corp. v. SensoryEffects Flavor Co.*, 613 F.3d 754, 758-60 (8th Cir. 2010)

(court emphasized that "knowledge of another's product and an intent to compete does not

correspond with an intent to mislead.")

Before launching its advertising campaign in 2017, MJUS determined, rightly, there would

be no confusion in the market arising out of MJUS' use of "kuhl" in its literal meaning as part of

an campaign highlighting Jägermeister's German heritage by using German words with the same

meaning and phonetic pronunciation when translated into English.  Moreover, Alfwear makes and

sells outdoor clothing, whereas MJUS distributes a German liqueur.  Alfwear has produced *no

evidence* that MJUS had any intent to benefit from Alfwear's reputation or goodwill, or any

evidence to dispute sworn deposition testimony by Opperman Weiss about its independent

conception and development of the "kühl" idea based on seeing graffiti in Berlin (not Alfwear's clothing) as part of a broader campaign highlighting Jägermeister's German heritage and the temperature at which it was to be served – ice cold.  (Ex. 16, Peddy 30(b)(6) Depo. 57:14-59:11, 103:22-106:3, 162:5-20; 163:5-14;164:8-19.)  *See King of the Mt. Sports*, 185 F.3d at 1091 (no likelihood of infringement where plaintiff produced no evidence defendants intended to derive benefits from plaintiff's existing mark).  Further, Alfwear can present no evidence of its reputation or goodwill among the relevant consuming public that MJUS could have even leveraged, particularly because MJUS had not heard of Alfwear or its clothing products before MJUS incorporated "kühl" into its planned advertising, and Alfwear's Kühl brand is ***not well-known or famous***.  (Ex. 6, Holt Survey Report, pp. 5-6, 38-39.)

3.   Evidence of Actual Confusion: None or <i>de Minimis</i>.

"[A]ctual confusion in the marketplace is often considered the best evidence of likelihood of confusion.' . . .  However, 'isolated instances of actual confusion [may] be de minimis.' . . . " *King of the Mt. Sports, Inc.*, 185 F.3d at 1092 (citing McCarthy, *supra*, § 23:14 ["Evidence of actual confusion of a very limited scope may be dismissed as de minimis: Probable confusion cannot be shown by pointing out that at someplace, at some time, someone made a false identification."].)  "'De minimis evidence of actual confusion does not establish the existence of a genuine issue of material fact regarding the likelihood of confusion.'" *Id.* (internal citations omitted.).  "Evidence of actual confusion is often introduced through the use of surveys, although their evidentiary value depends on the methodology and questions asked."  *Vail Assocs., Inc. v. Vend—Tel—Co., Ltd.*, 516 F.3d 853, 863 (10th Cir. 2008).  "Net confusion rates of 6.5% and negative 0.5% do not create a genuine factual issue of likelihood of confusion."  *Water Pik, Inc.*,726 F.3d at 1149.

*King of the Mt. Sports* is on point.  There, a plaintiff retailer of outdoor clothing and holder

of trademarks for "King of the Mountain," sued defendants, who put on a "King of the Mountain Downhill Series" ski race for trademark infringement. *King of the Mt. Sports*, 185 F.3d at 1087. Plaintiff argued defendants' use of the phrase created a likelihood of sponsorship confusion. *Id.* at 1088. The trial court granted Defendants' summary judgment on the trademark infringement claim. *Id.* at 1088-1089. On appeal, the Tenth Circuit affirmed and held that: no reasonable juror could find similarity between the plaintiff's stylized trademark and the ways in which defendants used the phrase and plaintiff presented no evidence defendants attempted to intentionally trade on plaintiff's reputation of goodwill (*Id.* at 1090-1092); there was a "disconnection" between plaintiff's clothing line and defendants' ski event (*Id.* at 1092); and as to confusion, the plaintiff put into evidence "at most, only seven examples of actual confusion," which was merely a "handful of anecdotal evidence" that was legally de minimis and "did not support a finding of a genuine issue of material fact as to the likelihood of confusion, especially in light of the complete lack of similarity between the defendants' uses and plaintiff's mark." (*Id.* at 1092-1093.)

Worse than the plaintiff in *King of the Mt. Sports*, Alfwear has identified *no examples* of bona fide customer confusion. Instead, Alfwear relies on the proffered expert opinion of Michael Belch, who performed a "Squirt" reverse confusion survey that purported to show confusion rates of 29.3% and 36% for the ads at issue. (Ex. 29, Belch Report, ¶ 30.) However, Dr. Belch has been excluded by courts in the Tenth Circuit before,[7] and his survey is fatally flawed: Dr. Belch failed

---

[7] His prior opinions have been criticized (and excluded) for lack of survey controls, for offering opinions that have no basis regarding the causes of confusion, for testing consumer perceptions based on a product name alone and divorced from the name of typical marketing materials consumers would encounter, for failing to turn over his surveys, and for asking questions that create bias. (Ex. 27 *Memorandum Opinion* dated Dec. 3, 2014 in *First Data Merchant Services Corp., et al. v. Securitymetrics, Inc.*, Case No. 1:12-cv-02568-RBD (D. MD. Dec. 3, 2014) (Doc. No. 313) striking Belch's report. See also *Water Pik, Inc. v. Med-Systems, Inc.*, 726 F.3d 1136, 1142-1150 (10th Cir. 2013) (Upholding the district court's determination that Dr. Belch's report had too many methodological flaws to be of any probative value and noting Dr. Belch's "irrelevant calculations," "fundamental problems," "nonsensical analysis" and "methodological shortcomings".)

to survey the relevant universe; he used the wrong survey method and stimulus presentation, which distorts actual marketplace conditions; he asked the survey participants leading and biased questions; and he failed to use a standard survey format.  (Ex. 7, Holt Survey Report, pp. 33-38.)[8]

The results of these errors are as follows:

- There is no evidence the Belch survey respondents would have been exposed to the MJUS Jägermeister ads through social media, or that the survey sample matches the age and gender distribution of Alfwear's customers

- Dr. Belch used the wrong survey method and stimulus presentation, leading to a fatal distortion of marketplace conditions where the competing advertisements were shown side-by-side, though Alfwear's clothes and Jägermeister would never be seen simultaneously by consumers or in close proximity

- Dr. Belch used a survey format (Squirt format) that would be appropriate only if the marks were encountered sequentially either in time or space or are sold together for a prospective purchaser, like Coke and Pepsi

- Dr. Belch asked leading questions that included the company names, which led respondents to create an association, a biased format producing biased results; and

- By failing to use a standard survey format including an initial question regarding source confusion, Dr. Belch deprived the respondents of the ability to come to their own conclusion on who put out the advertisement, by planting the seed in the respondent's mind that Alfwear's "Kühl" is responsible by showing their social media image on the same slide.

(Ex. 7, Holt Survey Report, pp. 33-38.)

According to the confusion survey conducted by Krista Holt, the net confusion percentage is 4.4% for the MJUS advertisements using the phrases "Kühl as Ice" and 0% for "Drink it Ice Kühl."  (Ex. 7, Holt Survey Report, pp. 5-6, 38-39.)

4.    Similarity of the Products and Manner of Marketing: No Similarities.

Generally, "'the greater the similarity between the products and services, the greater the likelihood of confusion.' (citations omitted). This is undoubtedly true when the action pertains to

---

[8] As noted in footnote 7, these are not new methodological errors for Dr. Belch, but repeat performances.

source or affiliation confusion." *King of the Mt. Sports, Inc.*, 185 F.3d at 1092. "The possibility of confusion is greatest when products reach the public by the same retail outlets.. . .Confusing similarity is most likely when the products themselves are very similar." *Beer Nuts, Inc.*, 711 F.2d at 941 (internal citations omitted). And, importantly, "[c]onflicting marks must be compared in their entirety, including any 'house mark' which one party may append to its mark." *See* 4 McCarthy § 23:43, at 23-217 to 218; *Water Pik, Inc.*, 726 F.3d at 1157 (the presence of the alleged infringer's house mark on defendant's package confirmed the court's view that similarity of mark factor weighed in favor of alleged infringer.)

The products here are totally distinct—rugged, outdoor clothing versus German liqueur— which are sold in different outlets: Kühl clothing is sold on its website and at REI stores; Jägermeister is sold at restaurants, bars, and grocery stores. (Ex. 4, Fay Depo., 16:4-17:19, 20:7-25; Ex. 18, Alfwear Resp. to Interrog. No. 2.) And, the advertisements and manner of marketing are entirely distinct: MJUS' advertisements for Jägermeister do not feature outdoor scenes including mountains, hiking, canoes, or rugged activities. Rather, the Jägermeister advertisements, placed on billboards, social media and during NHL hockey games, with "kühl" feature the Jägermeister mark, the deer head, cross-motif, the signature green bottle, shot glasses containing Jägermeister, and various elements of the product reflecting its Germanic heritage, and ideal consumption at an ice cold temperature. (Ex. 6, Silverman Report, ¶ 68; Ex. 10, JAG000013, JAG001914, JAG001906, and JAG001908.) Further, the "kühl" word was never featured alone in any MJUS advertising; rather, the word was always placed in the context of the larger Jägermeister brand and its elements, including the dark green bottle, the distinctive logo, the cross motif and deer head. (Ex. 6, Silverman Report, ¶ 68; Ex. 16, Peddy 30(b)(6) Depo., 138:1-139:16; Ex. 10 JAG00001-8, JAG000011-41.)

5.   <u>Degree of Care to be Exercised by Alfwear's Purchasers: High.</u>

"'A consumer exercising a high degree of care in selecting a product reduces the likelihood of confusing similar trade names.'"   *King of the Mt. Sports, Inc.*, 185 F.3d at 1092 (internal citations omitted).  "The general impression of the ordinary purchaser, buying under the normally prevalent conditions of the market and giving the attention such purchasers usually give in buying that class of goods, is the touchstone." 3 R. Callman, The Law of Unfair Competition, Trademarks and Monopolies § 81.2, at 577 (3d ed. 1969) (footnote omitted).  "Buyers typically exercise little care in the selection of inexpensive items that may be purchased on impulse. Despite a lower degree of similarity, these items are more likely to be confused than expensive items which are chosen carefully."  *Beer Nuts, Inc*., 711 F.2d at 941.  "If consumers are likely to exercise a high degree of care in deciding whose product to buy, the likelihood of confusion is reduced." *Water Pik*, *Inc.*, 726 F.3d at 1159.

Alfwear's purchasers, who are in an entirely different demographic from Jägermeister purchasers, likely exercise *significant care* when purchasing expensive outdoor clothing, which care would preclude any confusion between Alfwear's clothing and Jägermeister, which is not sold at the same price point.  The vast majority of Alfwear's customers are older and wealthier than a Jägermeister consumer; ████████████████████████████████████████████

████████████████████████████████.  (Ex. 19, Boyle Depo., 133:3-134:23; Ex. 17, Shapiro Depo., 32:12-34:3.)  ████████████████████████████████████████

████  (Ex. 17, Shapiro Depo. 111:6-112:15.)  ████████████████████████████

████████████████████████████████████  (*Id*., Shapiro Depo., 100:17-101:11.)

Beyond this, based on the difference in products, retail outlets and expense of the items, there is no reasonable chance that, based on MJUS' use of "kühl" in its advertisements, an individual who is looking to purchase Alfwear's clothing will purchase Jägermeister, or vice versa.

Furthermore, there is no reasonable likelihood a consumer would be confused about the origin of MJUS' products or Alfwear's products based on MJUS' descriptive, non-trademark use of "kühl." (Ex. 6, Silverman Report, ¶¶ 40-43, 69; Ex. 7, Holt Survey Report, pp. 5-6, 38-39.)

      6.     Alleged Strength of Alfwear's Marks: Extremely Weak.

Generally, the stronger a trademark, the more likely that "encroachment upon it" will lead to sponsorship confusion. *First Sav. Bank, F.S.B. v. First Bank Sys.*, 101 F.3d 645, 653 (10th Cir. 1996).  "A strong trademark is one that is rarely used by parties other than the owner of the trademark, while a weak trademark is one that is often used by other parties."  *Id.* (internal quotation marks and citations omitted).  When assessing the relative strength of a mark, courts consider the two aspects of strength: "Conceptual Strength: the placement of the mark on the [distinctiveness or fanciful-suggestive- descriptive] spectrum;" and "Commercial Strength: the marketplace recognition value of the mark." McCarthy, *supra,* § 11:83.

Under the "conceptual strength" prong, the categories, in descending order of strength, are: fanciful; arbitrary; suggestive; descriptive; and generic. See *id*. at § 11:1; (citation omitted). Fanciful marks consist of "coined" words invented or selected solely to function as a trademark. McCarthy, § 11: 5.  "Arbitrary marks comprise those words, symbols, pictures, etc., that are in common linguistic use but which, when used with the goods or services in issue, neither suggest nor describe any ingredient, quality or characteristic of those goods or services." *Id*. at § 11:11. "Suggestive marks suggest some quality or ingredient of the goods."  *See id*. at § 11.62; *King of the Mt. Sports, Inc*., 185 F.3d at 1093.

Extensive third-party use of the disputed term indicates that the term itself deserves only weak protection.  *Freedom Sav. & Loan Ass'n v. Way*, 757 F.2d 1176, 1182 (11th Cir. 1985).  And while it is true that "[e]vidence of a mark's commercial strength can make up for conceptual weakness because conceptually weak mark may become strong by virtue of acquired consumer

awareness," such a rule applies to well-known brands like American Airlines, Payless Shoes, Ford, and Kentucky Fried Chicken. *Water Pik, Inc.*, 726 F.3d at 1153. Even "a mark with conceptual strength may ultimately be weak if its commercial strength is negligible." *Id.*

First, concerning conceptual strength, "kühl" as applied to clothing cannot be reasonably described as a fanciful mark because Alfwear did not coin the word and it was not invented or selected for the purpose of functioning as a trademark; it is an actual German word. Alfwear's use of "kühl" is not arbitrary because kühl, while easily transliterated into English as "cool," is not in common linguistic use in the English language in the German form. The mark is also not suggestive because it does not suggest any quality or ingredient of Alfwear's clothing.

Second, as to commercial strength and the marketplace recognition of the mark, the only trademark fame survey conducted in this case shows that Alfwear's "kühl" marks are not famous or well known. (Ex. 6, Holt Survey Report, pp. 5-6, 38-39.) Critically, many companies nationwide use "kühl" or "kühl" marks in their business. (Exs. 25-31.) The Tenth Circuit "recognize[s] the well-established principle that extensive third-party use of the disputed term indicates that the term itself deserves only weak protection." *First Sav. Bank, F.S.B. v. First Bank Sys.*, 101 F.3d 645, 654 (10th Cir. 1996) (citing *Freedom Sav. & Loan Ass'n v. Way*, 757 F.2d 1176, 1182 (11th Cir. 1985) (third-party usage contributed to finding that FREEDOM was weakly protected); *Sun Banks of Fla., Inc. v. Sun Fed. Sav. & Loan Ass'n*, 651 F.2d 311, 316 (5th Cir. 1981) ("we find the extensive third-party use of the word 'Sun' impressive evidence that there would be no likelihood of confusion between Sun Banks and Sun Federal."). "The proper inquiry is whether the third party use significantly diminishes the public's perception that the mark identifies services connected with the owner." *Breakers of Palm Beach, Inc., v. International Beach Hotel Development, Inc.*, 824 F. Supp. 1576, 1583 (S.D. Fla. 1993); *Trilink Saw Chain, LLC v. Blount, Inc.*, 583 F. Supp. 2d 1293, 1312 (N.D. Ga. 2008).

As noted above, and as a Google search or a search of the USPTO TTAB public records shows, "kühl" and "kuhl" marks and trade names are used by many third parties for a myriad of products and services, including clothing, services, and beverages.  (Ex. 25-31.)  It is simply not the case that Alfwear is the only company using kühl/kuhl marks or even the most well-known.  It is not even the only clothing company using those marks.  (Ex. 26.)

Indeed, even "[e]vidence that [a plaintiff's] products had millions of users and that its products were sold through well-known retailers does not tell us whether the sales were stimulated by the mark."  *Water Pik, Inc.*, 726 F.3d at 1554-1555; *see Bose Corp. v. QSC Audio Products, Inc.*, 293 F.3d 1367, 1375 (Fed. Cir. 2002) ("Raw numbers of product sales and advertising expenses may have sufficed in the past to prove fame of a mark, but raw numbers alone in today's world may be misleading…Consequently, some content in which to place raw statistics is reasonable.")  As Alfwear's executives testified at deposition, Alfwear intentionally limits the distribution of its "kühl" clothing and intentionally avoids the largest retailer, Amazon.  (Ex. 6, Holt Survey Report, pp. 14-16.)  Thus, by Alfwear's own admission, its products sold under the "kühl" marks have limited reach and cannot possibly support any level of fame or secondary meaning in the minds of consumers sufficient to sustain Alfwear's trademark claims against MJUS.  Courts are clear that the owner of a registered mark may not appropriate descriptive language through trademark registration. *See M.B.H. Enters. v. Woky, Inc.*, 633 F.2d 50, 55 (7th Cir. 1980) (the court said the owner of a registered mark "may not appropriate to itself common English slang terms and thus prevent others from using such phrases in their descriptive sense"); *Blau Plumbing, Inc. v. S.O.S. Fix-It, Inc.*, 781 F.2d 604, 609-10 (7th Cir. 1986) ("[Plaintiff] cannot appropriate the English language, and by doing so render a competitor inarticulate."); *Sands, Taylor & Wood Co. v. Quaker Oats Co.*, 978 F.2d 947, 951 (7th Cir. 1992) ("…no one should be able to appropriate descriptive language through trademark registration.")  That is precisely what

Alfwear attempts to accomplish through trademarking a common German word easily understood in English.

A mark that lacks distinctiveness or is "merely descriptive" has no protections under trademark law. *See* 15 U.S.C. § 1052(e) ("No trademark by which the goods of the applicant may be distinguished from the goods of others shall be refused registration on the principal register unless it . . . [c]onsists of a mark which . . . when used on or in connection with the goods of the applicant is merely descriptive . . . of them.") (emphasis added).  Trademark protection is only afforded to descriptive terms that, through extensive use and promotion (as a mark) acquire a meaning among a significant portion of the relevant consuming public that designates a <u>particular</u> merchant as the source for goods and services offered under the term.  *See* 15 U.S.C. § 1052(f); *Armstrong Paint & Varnish Works v. Nu-Enamel Corp.*, 305 U.S. 315 (1938); *Kellogg Co. v. Nat'l Biscuit Co.*, 305 U.S. 111, 113 (1938).  This requires that the primary significance of the descriptive term in the minds of the consuming public is no longer the original descriptive meaning, but rather is a secondary, source-identifying meaning.  *See Kellogg*, 305 U.S. at 113. "'Marks that are merely laudatory and descriptive of the alleged merit of a product are also regarded as being descriptive. . . . Self-laudatory or puffing marks are regarded as a condensed form of describing the character or quality of the goods."  *In re Bos. Beer Co.*, 198 F.3d 1370, 1373 (Fed. Cir. 1999) (citing 2 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 11:17 (4th ed. 1996)).

At best, Alfwear's "kühl" marks may be descriptive, but Alfwear has presented no evidence that its "kühl" marks have acquired secondary meaning—i.e., a "mental association in buyers' minds between the alleged mark and a single source of the product."  McCarthy, *Trademarks and Unfair Competition* § 15:5, at 15-9 (4th ed. 2001); *see also* 2 McCarthy, *Trademarks and Unfair Competition*, § 11:35 (5th ed.) (citing Restatement Third, Unfair Competition § 14, comment a

(1995) ("If a descriptive foreign term is similar to its English equivalent, prospective purchasers are likely to understand the word in its descriptive sense, and proof of secondary meaning is therefore required to establish trademark rights.")).  "A mark acquires secondary meaning when it has been used so long and so exclusively by one company in association with its goods or services that the word or phrase has come to mean that those goods or services are the company's trademark."  *Packman*, 267 F.3d at 641 (citations omitted).

Here, Alfwear's "kühl" marks lack distinctiveness; they are merely descriptive of the cold weather in the outdoors where the clothing is worn, consistent with Alfwear's "born in the mountains" mantra always used with mark, or laudatory in terms of ascribing a positive characterization of its clothing products—i.e., that they are cool.   (Ex. 3, ALF000062, ALF004030).  In either case, there is no evidence they have acquired secondary meaning among the relevant consuming public that Alfwear is the source for clothing offered under the "kühl" brand.  Instead, as confirmed by the only fame survey conducted in this case, the marks are not famous as a matter of law.  (Ex. 7, Holt Survey Report, pp. 5-6, 38-39.)  There is no evidence that the primary significance of "kühl" in the minds of the consuming public is a secondary, source-identifying meaning signifying Alfwear.  *See Kellogg*, 305 U.S. at 113.

**D.      Alfwear's Unfair Competition Claim Necessarily Fails.**

Finally, MJUS is entitled to summary judgment on Alfwear's unfair competition claims, which are predicated on the alleged trademark violations, because the claims rise and fall together. *See Garth O. Green Enters. v. Harward*, No. 2:15-cv-00556-DN, 2016 U.S. Dist. LEXIS 178938, at *21 (D. Utah Dec. 27, 2016) ("Without a valid claim to the trademark rights at issue, [plaintiff] cannot sustain an unfair competition claim" arising under federal and state law) (citing *Utah Lighthouse Ministry v. Found. for Apologetic Info. & Research*, 527 F.3d 1045, 1050 (10th Cir. 2008)).  Additionally, "where a defendant's use of a phrase is 'fair use' for purposes of trademark

infringement, defendant's conduct cannot be 'unfair' for purposes of a Lanham Act unfair competition claim." *Bell*, 539 F. Supp. 2d at 1262; *Zatarains, Inc. v. Oak Grove Smokehouse, Inc.*, 698 F.2d 786, 796 n. 9 (5th Cir. 1983); *Wonder Labs, Inc. v. Proctor & Gamble Co.*, 728 F. Supp. 1058, 1064 (S.D.N.Y. 1990).  Here, for the reasons outlined above, Alfwear's unfair competition claims fail with its trademark infringement and dilution claims, based on the same legal infirmities.

## V.   CONCLUSION

Based upon the foregoing, Defendant respectfully requests the Court grant summary judgment in favor of MJUS on Alfwear's claims for trademark infringement, federal and common law unfair competition, and trademark dilution.  MJUS also requests a hearing on this motion.

Dated: September 17, 2020                    Respectfully submitted,

*/s/ Craig J. Mariam*
Craig J. Mariam (*Pro Hac Vice*)
Mark A. Nickel (14082)
Hazel Mae B. Pangan (*Pro Hac Vice*)
Garrett M. Fahy (*Pro Hac Vice*)
**GORDON REES SCULLY**
**MANSUKHANI, LLP**
460 W 50 N, 5th Fl.
Salt Lake City, UT 84101
Telephone: (801) 204-9989
Facsimile: (385) 282-7590
cmariam@grsm.com
mnickel@grsm.com
hpangan@grsm.com
gfahy@grsm.com

*Attorneys for Defendant*
*MAST-JAEGERMEISTER US, INC.*

### CERTIFICATE OF SERVICE

I hereby certify that on this 17th day of September, 2020, a true and correct copy of the foregoing document was filed electronically with the Clerk of the Court using the Court's CM/ECF electronic filing system, which will send an electronic copy of this filing to all counsel of record.

*/s/ Craig J. Mariam*
Craig J. Mariam